Thank you. May it please the Court. My name is Donald Mooney. I'm representing Appellant Butte Environmental Council. The case before the Court, there's two issues. One is the issue of the Section 404 permit and whether or not it was appropriate. And the issue is the least environmentally damaging practical alternative. Now, the case is, to me, it's interesting that the Army Corps of Engineers Well, with respect to this 404 issue, we're on an arbitrary and capricious standard of review, are we not? Yes, we are. Which is a pretty high threshold. I agree with Your Honor. All right. But the arbitrary and capricious, what transpired here was there was a proposal for this business park. The Army Corps of Engineers and the EPA were involved in this process from the very beginning. Their staff were. They consistently said, we believe the alternative to, the preferred alternative, is not the LEDPA. And there is correspondence after correspondence of that. And then, and they would ask for additional information. They would ask for, and then when there was a supplemental environmental impact report prepared, there's more correspondence from the Corps and the EPA that we've set forth in the briefs, saying there continues to be a problem. This is still not, we don't think you've made your case that this is the LEDPA. We think that, in fact, they even say we think that alternative 4 and alternative 2 would, or the other alternative 2 would be the more, or alternative 3, I believe it was, are the more the LEDPA for this. The government argues that under the Friends of Earth v. Hines case, and they also talk about the National Association of Home Builders case, where the agency's allowed to change its opinion. And I don't dispute that the agency's not allowed to change its opinion. But in the present case, it's not that the agency, there's nothing to support the change in the position of the agency. In the Hines case, or Hintz case, I guess it is, the agency issued some preliminary thoughts about the project. The reports were then prepared. The agency, or the applicant then prepared various reports. The agency, after having reviewed those reports, changed its position, changed its mind, based upon the reports that were prepared. In the present case, what we have is we have the Army Corps, the reports that are cited in the government's brief, that they claim that the Corps relied upon, were all prepared approximately a year before, some of them maybe even more in the studies, were prepared prior to even the environmental impact report and prior to the correspondence from the agencies. So the agencies, the agencies being the Corps and the EPA, already had that information available to them. They then comment on it, say, this is not the least environmentally damaging practical alternative. We think that there are others. And I'd point out, even though there's arbitrary and capricious standard for the agency, it is upon the, the case law clearly indicates that it is, the burden is on the applicant to demonstrate what is the least environmentally damaging practical alternative. So they do a supplement on the IS. The agency still, both the Corps staff and the EPA, still say, hey, we're disappointed. We thought you were going to, we thought we were going to modify this. You didn't do it. Then the Corps provides the public notice about the, about the application and asks for comments on it. And the EPA comments to the Army Corps of Engineers, basically said, we thought you were going to fix this before you went to public notice on it. There's nothing in the record to show why the Corps suddenly changed its position and decided to issue the. The other side, of course, obviously wouldn't agree with you. And what appears to me is that you're downplaying the extent to which the city modified its original plan in response to the comments. They changed the footprint to reduce impacts to waters, designated 296 acres of the 678-acre site as permanent open space. Other changes to direct wetlands impacts. And the proposed site was reduced from 7.13 acres to 650 acres. So there was something in there that happened. There was. And I acknowledged that in my brief. You said there was nothing. Well. There was something. Okay. Then I stand corrected, Your Honor. They did do some modifications, and we did address that in our brief. But the EPA, in the comments on, I believe it was the supplemental EIS, the EPA said, yes, we acknowledge you did something, but it's clearly not enough to satisfy the requirements of the Clean Water Act in terms of the LEDPA. And I think even it was about 11% reduction in the impacts with regards to wetlands. And the EPA at that point was still saying that you still haven't made your case for the least environmentally damaging practical alternative, that this project satisfies that requirement. And what I point out is that the concern here is the path in which the Corps made its decision. I mean, it was clearly critical of the project up until the time it issued the public notice. And then issued its decision document. Now, the National Association of Homebuilder case that the government cites and talks about that they're allowed to change their position, but that case also says that it acknowledges that a court will uphold a decision of less than ideal clarity if the agency's path can reasonably be discernible. Here I would submit to the Court that the agency's path is not reasonably discernible. So there's this gap in that the agencies had said one thing consistently through the process. They had consistently, and even when there were some modifications to the project, the agency said, no, that's not sufficient. When did they reject the Mitchell site as an alternative? They rejected the Mitchell site. It's my understanding the Mitchell site was not part of the environmental review process as one of those alternatives. It got kind of added into the process after the application or during the public notice. And they included it in the decisional document and discussed the Mitchell site in the decisional document. Yeah, saying the Mitchell site wouldn't work. I mean, I can discern the path that they took. You just don't like the path. I can discern it. The Mitchell property, I mean, we think that the Mitchell property is also the fact that there's, we talked about in our brief, the market entry in terms of whether or not there were some problems in terms of, I think, how they evaluated the Mitchell property. Yeah, but they didn't rely on the valuation. They said it wasn't contiguous with property already owned. The topography and geology wasn't conducive. The amount of property was too small to achieve the project purpose. So they had other things than the difference between the million and $12 million valuation problem between 2001 and 2006. But I still would submit that by throwing the Mitchell property in to the mix in terms of alternatives being looked at, still didn't address the EPA and the course staff's concerns and criticisms of the preferred project. The problem is, is that there's nothing, the agency that approved the project, its staff had repeatedly criticized the project. There's nothing in the record that says ---- But there's an evolution here. There's a back and forth. And the project is not, the project as approved is not the same as the project as it originally applied for. Isn't this precisely what's supposed to go on in this whole environmental review process? Yes, and I'll also say no. I mean, the back and forth is supposed to go on. But there should be something in the record. When the agency, when that back and forth goes back, when it's going back and forth, and the agency continues to say, we continue to have problems with it, we continue to think that this project ---- Until they finally signed off. Until they signed off. But there's nothing, there's nothing in the record that says, okay, from, say, the Corps of Engineers, other than the decisional document, I will submit that. But from the criticism, it says, you have now addressed our concerns. You've now addressed the points that we have raised. And we think that this is the LEDPA. Up until even with the public notice that was issued, EPA was still saying, where's the information you have promised us for so long? And in the government's brief, their response to that is citations to reports that were prepared prior to this back and forth even starting. Nonetheless, they're there. They are there, yes. They are there. But it was the agencies, the Corps and the EPA, that both said during the process, the information in those reports is not sufficient. They're the ones that said, they're the ones that are critical. To me, it would be a different situation if you had an outside group criticizing those reports and the agency said, no, we think those are sufficient. But this is the agency saying that's not sufficient. And then it's the agency that suddenly approves the project. And there's no, and with all due respect, with your previous question, Justice Strott, there's no discernible path from all of that criticism to the approval. There's this gap. And even, as I said, even the EPA said when the public notice was issued, says, wait a second, we've been talking about this for quite some time, and we were promised that there was going to be some modifications. And they're not, or they're not sufficient enough to address the concerns that we raised. And there's nothing in the record, say, from the time between the supplemental EIS being issued or the public notice that says, here's some more studies for the Army Corps to rely upon. My time is running short. I was going to just very quickly address the critical habitat issue. On the critical habitat issue, there was some confusion, maybe in the briefs, about whether it was challenging the no jeopardy determination versus the no adverse modification. I'll just clarify for the Court. We are limiting it to the adverse modification issue. And the concern in terms of the at one of the big concerns, and we addressed this in the brief, in terms of the adverse modification issue, is that there was nothing that addressed, in the biological opinion, the rate of loss either locally or throughout the critical habitat. The original guidelines require them to take a look at rate of loss? I don't think they specifically say. Or any regulation or statute? I don't think they specifically say you must look at rate of loss. But when you have within the Reading Corps region, around 5% loss from this project, and acknowledging that for the critical habitat region-wide or throughout the state, or the range of the species, that it was 0.1% and 0.24% and those things. But if you have rate of loss, and they acknowledge in there the fragmentation of the critical habitat, locally as well as throughout the range,  saying that this project will only have 0.1% impact or 0.25% or 5% locally, you really can't make that determination, or I would say that determination with regards to adverse modification is arbitrary and capricious because you're not looking at the whole picture. And the Gifford Pinchot case, I believe it was, although there's no regulation, says you can't look at, you shouldn't look at the picture so broadly as to mask the impacts. And we believe that that's what was done here with regards to the critical habitat. Thank you. Thank you, Counsel. Your time has expired. We'll hear from the government. May it please the Court, my name is Kurt Kastorf, and I represent the United States. For more than a decade, the city of Redding has sought to develop a business park using federal grant money. Redding believes that a large, ready-to-go business park is the best way to reverse a slow but steady decline in their economic growth and stagnating or decreasing wages. Did they build the park, by the way? The park is in construction and is currently marketing itself. It has a fairly elaborate website designed to encourage large parcel units to move in. I want to start with a standard of review. The case is about whether either the United States Army Corps of Engineers or the U.S. Fish and Wildlife Service was arbitrary or capricious in allowing the project to proceed. Both the Corps and the Fish and Wildlife, as appellants mentioned, have been involved in this project since the very beginning, and they've engaged in extensive on-site analysis requiring a high level of scientific expertise. An on-bank panel of this Court ruled in Lent Counsel v. McNair that this is the precise sort of case where a court should afford substantial deference to the agency. If you want to answer counsel's claim that, look, all these objections were raised and all of a sudden without any explanation they just seemed to disappear and basically they just caved in instead of giving it the hard look that it was entitled to. Well, first, Your Honor, I don't think that's an accurate statement of the record. The record shows that two different things happened. The first is that the City continued to develop a substantial record justifying the need for a 100-acre parcel. One of the Corps and EPA's initial concerns is that the City was arbitrarily eliminating particular alternative sites by insisting that they needed to have a 100-acre parcel. As it turns out, the City was able to identify a substantial body of evidence showing that a large parcel was required. In particular, they cited to a number of independent commission studies. They also used examples from other developments in Lincoln, in Roseville, Folsom, Sacramento, and Reno. And I think most persuasively the settlement was able to identify specific businesses that had expressed interest in a large parcel. Lowe's expressed interest in 125 to 200 acres, Walmart in 130 to 150 acres, Rite Aid in 85 to 100 acres, and Microchip in 80 acres. In addition, the State of California represented nine anonymous businesses, three of whom wanted larger than 100-acre sites. The second thing that happened is that the Corps and the EPA worked directly with the City of Reading to reduce the environmental impact of the proposed project. Through this consultation, the City reconfigured lots to avoid major wetland complexes. It reduced the number of roads and trails that they were constructing. It repositioned a large power line. It developed a stormwater utilization plan. And it created easements around the project to buffer it from a conservation zone. One quantifiable indicator of the success of these measures is that it was able to reduce the impact on wet vernal pools by 11.64 percent. So there's a substantial body of evidence showing what happened after those letters were written that addressed the Corps' concerns. The other thing I would say is that it seems, at least from Pellin's argument, that he would concede that if these letters were never written, there's sufficient evidence in the record to justify this decision. So if you punish the Corps and EPA for vigilantly criticizing the project during the length of the project, I think it would create a perverse incentive for administrative agencies. Essentially what it says, if instead of the Corps and EPA getting involved at this project from the very beginning, they had simply shut their mouth and not said anything, then this case wouldn't be able to come forward and there wouldn't be a risk of reversal. I don't think that's the correct incentive to create in administrative agencies. Well, what about the discernible path point that counsel makes, presumably from some of our cases? Well, I think I've outlined some of the discernible path. One is that although some of these studies exist to justify the 100-acre parcel, the City of Reading repeatedly revised its site proposal to make it clear why it was the 100-acre parcel that was necessary and not simply an aggregated centralized business park. The other thing is that the Corps was able to work repeatedly with the agency to develop the project. And I think implicit in the final decision, of course, when they finally found that the proposed site would be the least environmentally damaging practical alternative, is a statement that, okay, this is enough. You finally reached that threshold. At some point it becomes a semantic distinction if appellant thinks that the physical decision document needed to say, and oh, by the way, if it's not obvious, we now think you've satisfied our standard. I'm not sure that the particular path needs to be so clearly articulated that that's the standard. The final thing I would note is that the Supreme Court has said that in the case where there's not an articulated and clear path, the correct remedy would be to ask the agency to clarify the path, not reverse the project. Very well. Anything further, counsel? How about the ESA for just a moment? Sure. Appellant's claim against fish and wildlife is that the finding of no adverse modification to the habitat of sensitive species was arbitrary and capricious. I think appellant's challenge fundamentally misunderstands the nature of the adverse modification inquiry. Appellants point to several statements from the biological opinion in which fish or wildlife explains where there might be an adverse effect on the species. But the possibility of adverse effect is not sufficient for an adverse modification finding. Following this court's decision in Gifford-Pinchot, the relevant question is whether the critical species habitat will be modified so as to appreciably diminish the value of that habitat for the survival and recovery of the species. Here there are two primary reasons for thinking that that won't occur. One is the project's effect on the species' entire critical habitat will be extremely small. The project would result in an overall reduction of critical habitat by 0.04% for the fairy shrimp, by 0.1% for tadpole shrimp, and by 0.26% for orchid grass. These small reductions don't appreciably diminish the species' chance of recovery. And what is in the report that addresses the recovery part of adverse modification? Well, there is a substantial conservation plan. There's about, I think, six to eight pages of the report are discussing the potential for conservation in the project area. The result of the project would be to create a substantial conservation easement, often at ratios larger than the diminishment of habitat. For example, a lot of the ratios get recreated at four to one. So the effect of this particular project would be to increase, not reduce, the potential recovery area of the species. In addition, there is a section that directly analyzes cumulative effects, which is the actual standard. There's not a specific requirement to address rate of loss. There's a requirement to address cumulative effects. At the district court stage, appellants had some criticisms of the cumulative effects analysis that they don't raise on appeal, but that is the cumulative effects process is designed to account for rate of loss. Okay. Unless there are any other questions. No further questions. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. All rise.
judges: O'scannlain, Trott, Paez